Randall BILLS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 91–SC–551–MR.

Supreme Court of Kentucky.

March 18, 1993.

Rehearing Denied May 27, 1993.

Larry H. Marshall, Asst. Public Advocate, Department of Public Advocacy, Frankfort, for appellant.

Chris Gorman, Atty. Gen., Ian G. Sonego, David A. Smith, Asst. Atty. Gen., Frankfort, for appellee.

WINTERSHEIMER, Justice.

Bills appeals from a judgment of the circuit court sentencing him to a total of 60 years in prison. He received 20 years for kidnapping; 20 years for first-degree sodomy; two years for first-degree sexual abuse; and six months for unauthorized use of a motor vehicle. He was also convicted of being a first-degree persistent felony offender. The sodomy first-degree was enhanced to 60 years and the first-degree sexual abuse was enhanced to ten years. The enhanced sentences were ordered to run concurrently for a total of 60 years in prison.

Bills presents seven issues for review which shall be treated separately. This Court granted oral argument to consider

the relationship between the violent offender statute, K.R.S. 439.3401, and the persistent felony offender statute, K.R.S. 532.080 and the application of both statutes in regard to minimum parole eligibility.

At trial the victim testified to a night of terror and various sexual assaults. She stated that Bills forced his .way into her motel room and struck her in the face, neck, arm and stomach five or six times. Bills said he had a gun and that if she did not cooperate he would kill her. Bills also threatened to stab her with a knife. The victim screamed and tried to push him away. Bills squeezed her throat to the point that she could no longer scream or breathe. Eventually, he released his grip on her throat. The occupant of an adjoining room testified that he had heard a commotion coming from the room where the victim was and thought that someone might have been killed.

The victim testified that Bills put a chair between her legs and started touching her thigh. They stayed in the motel room approximately twenty minutes and left about 9:45 p.m. She testified that Bills repeatedly threatened that if she ran away he would shoot or kill her. She was forced to drive her car for approximately 30 to 40 minutes to a swampy area near a church. During the trip, Bills repeatedly threatened the victim with a gun while she was driving.

While the car was stopped in the area of the church, Bills demanded something from her which he could use to identify her in case she went to the police. Bills threatened that he would find the victim and kill her and everyone she cared about if she ever went to the police. The victim gave Bills an old business card with inaccurate information. He then demanded that the victim perform oral sex. Bills lifted her sweatshirt, dropped his pants, grabbed the victim's head and forced her face down upon his penis and started touching her. Bills was able to place his penis in the victim's mouth for approximately thirty seconds. The victim conceded that she had told a Kentucky State Police detective in a written statement that she had kept her mouth shut during the oral sex act, but on cross-examination, she explained that she meant that she did not open her mouth voluntarily.

Eventually a Sheriff's car happened upon the scene. Bills left the car to talk to the Deputy. While Bills was speaking to the Deputy Sheriff, the victim exited the car and Bills immediately fled the scene. After Bills ran off, the deputy found the victim crying in the car. The victim told the deputy that Bills had tried to rape her.

Bills was apprehended later that night at his residence. As he left his house, he told his wife to keep her "goddamn mouth shut" and not let the police in the house. Subsequently Bills' wife signed a consent to search form. The victim's business card was found on the mantelpiece.

Bills testified in his own defense. He stated that he was able to recall certain events and not able to recall others. He said he spent most of the day at a friend's house drinking beer and vodka. Bills testified that while walking through the parking lot of the Days Inn, he saw the victim and asked her for a ride home because he was intoxicated and his truck had broken down. Bills thought she gave permission to use the telephone in her room.

Bills claimed he did not remember striking or pulling a gun on the victim and denied using force to induce the victim to get into the car. Bills stated he did not remember why he asked or whether the victim performed oral sex on him, but it could have happened. He did not remember if he forced her to perform oral sex but he could have. He did remember unzipping his pants, the victim giving him the business card, and the victim saying her husband could provide Valium to him at a discount.

Bills testified that when the Sheriff's car drove up, he did not flee because he didn't think he had done anything wrong. However, when the victim started yelling, "He's trying to rape me," he got scared and ran. Upon conviction by the jury, Bills appealed.

■ We first consider the relationship between the violent offender statute and

the PFO law. Bills was convicted of the sodomy charge and as a PFO I. He was sentenced to 20 years for the sodomy. This was enhanced to 60 years because of the PFO I status. The question presented is whether the operative language of the PFO statute or the violent offender statute controls the availability of parole. The PFO statute specifies that Bills will not be eligible for parole until he has "served a minimum term of incarceration of not less than (10) years." K.R.S. 532.080(7). Thus, Bills must serve at least 10 years of his 60 year sentence before being eligible for parole. This does not mean that Bills will be released on parole after 10 years, but only that he may not be considered for parole until serving at least 10 years.

The sodomy conviction also places Bills' conviction within the category of the violent offender statute. K.R.S. 439.3401. Pursuant to this statute, Bills must serve at least 50 percent of his sentence, which would be 30 years. Only after this amount of time could Bills be eligible for parole. Application of the two statutes together indicates that Bills must serve at least 10 years, pursuant to K.R.S. 532.080(7), the PFO statute, and may not be released until he has served at least 30 years, pursuant to K.R.S. 439.3401(3), the violent offender statute. The two statutes clearly do not conflict.

However, the decision of this Court in *Sanders v. Commonwealth*, Ky., 844 S.W.2d 391 (1992), rendered November 19, 1992, which interprets K.R.S. 439.3401 as it relates to sentences of life and terms of years, requires some modification of the 30–year minimum. Accordingly, Bills will not be eligible for parole until he has served at least 12 years, the "cap" or ceiling set by K.R.S. 439.3401(2) on the parole ineligibility.

It is the holding of this Court that the violent offender statute, K.R.S. 439.3401, and the persistent felony offender statute, K.R.S. 532.080, are not in conflict. Application of each statute must be considered in light of the individual circumstances of a specific situation.

I

■ Bills contends the trial court committed reversible error by denying his request to instruct the jury on attempted first-degree sodomy. Bills submits that because the victim told the police in a written statement that she had kept her mouth closed during the attempted oral sex act, the jury could have found that Bills' penis only touched the victim's mouth.

Bills next claims that under Kentucky law, penetration is required to constitute fellatio, and under the rule of lenity, doubts in the construction of a penal statute should be resolved in favor of the defendant. *Boulder v. Commonwealth*, Ky., 610 S.W.2d 615 (1980). Thus, under these facts the jury could have found that Bills committed only attempted sodomy.

We cannot accept Bills' interpretation of the statute. The statutory definition of deviate sexual intercourse is applicable to the act of fellatio. Bills admits the definition does not mention penetration. However, he claims that the fact that the statute also does not provide that "mere contact" between the penis and the mouth constitutes deviate sexual intercourse, renders it ambiguous. K.R.S. 510.010(1) states, "Deviate sexual intercourse" means any act of sexual gratification involving the sex organs of one person and the mouth or anus of another. *Hulan v. Commonwealth*, Ky., 634 S.W.2d 410 (1982), held that penetration is not a necessary element to the crime of sodomy as defined in the penal code. This Court has repeatedly rejected arguments requiring the court to add language to a statute which was not included by the General Assembly. *See Commonwealth v. Shivley*, Ky., 814 S.W.2d 572 (1991).

■ An alternative instruction is required only if, considering the totality of the evidence, the jury might reasonably conclude that the defendant was not guilty of the charged offense, but was guilty of the lesser offense. *Reed v. Commonwealth*, Ky., 738 S.W.2d 818 (1987). Bills' inability to recall the event provided no evidence at all regarding the claim of entitlement for the lesser included offense of

attempted first-degree sodomy. Penetration is not a requirement under the sodomy statute. Therefore, the only possible inference from the victim's testimony is that Bills' penis came into contact with her mouth. The trial court correctly determined that there was no evidence submitted to support an instruction on attempted first-degree sodomy.

## II

■ Bills argues that the trial court erred by refusing to instruct on first and second degree unlawful imprisonment. Bills maintains that the unlawful imprisonment instructions were justified by the evidence and that the evidence of unlawful imprisonment predominated over the evidence calling for a kidnapping instruction. This claim is without merit. There was testimony from two witnesses concerning these events. There was no evidence presented which would justify an instruction on either degree of unlawful imprisonment. Under K.R.S. 509.020, a person is guilty of unlawful imprisonment in the first degree when he or she knowingly restrains another person under circumstances which expose that person to a risk of serious physical injury. Unlawful imprisonment in the second degree requires only the element of restraint. K.R.S. 509.030.

Bills testified that he asked the victim if he could use her phone. He believed that she said yes. He conveniently did not remember assaulting her or threatening her with a gun. He said he told her he wanted her car. He testified that without any force from him the victim got in the car and drove him to within about two miles of his house. He testified that on the way there, the victim stopped at a liquor store and got out of the car and bought him liquor. He further testified that when the Sheriff's car arrived on the scene, he did not initially flee the scene because he didn't think he had done anything wrong. His testimony indicated that the victim in fact voluntarily attempted to drive him home.

Even accepting Bills' argument that the victim was given the choice to remain at the motel and relinquish possession of her car, or to travel with Bills, the facts in dispute do not concern the elements that differentiate kidnapping from unlawful imprisonment because the undisputed evidence indicates that the victim was clearly subjected to bodily injury during the course of the restraint.

The victim's testimony disputed Bills' version. She testified that Bills held her prisoner inside her motel room for at least 20 minutes while he struck, choked, threatened and touched her body in an inappropriate, sexual manner. A KSP detective testified and identified a photograph he took of the victim showing a black eye. Her testimony was also corroborated by the occupant of an adjoining room. She testified Bills forced her to leave the motel room, get into the car in her possession, and while riding in the automobile, Bills threatened to kill anyone she cared about if she ever went to the police.

Under K.R.S. 509.040(1) a person is guilty of kidnapping when he or she uses unlawful restraint with the intent to ... (b) accomplish or advance the commission of a felony; or (c) to inflict bodily injury or to terrorize the victim or another. The testimony of the victim justified an instruction on kidnapping under both § (b) and (c). Nothing in the testimony of either witness to this episode would justify an instruction on unlawful imprisonment. The trial court committed no error.

The cases cited by Bills, *Cannon v. Commonwealth*, Ky., 777 S.W.2d 591 (1989) and *McClellan v. Commonwealth*, Ky., 715 S.W.2d 464 (1986) are inapplicable to the facts presented here. In *Cannon*, this court found that there was no evidence in the record that the defendant had an intent to inflict bodily injury on the victim at any time while she was being restrained. In this case the victim presented graphic testimony that Bills repeatedly struck and threatened her.

The facts in the *McClellan* case are also dissimilar to this situation. In *McClellan*, the defendant "maintained throughout the trial that his acts were motivated out of love and concern for his wife and her child and in an attempt to preserve the family

relationship." Here, Bills and the victim were strangers before the episode began. Moreover, Bills denied unlawfully restraining the victim.

Bills also complains that the evidence of intoxication justifies an instruction on lesser-included offenses because the intoxication would have made his intention open to question. We will not consider this claim because it was not properly preserved for review. RCr 9.54(2); *Commonwealth v. Duke*, Ky., 750 S.W.2d 432 (1988).

### III

The trial court did not commit reversible error concerning its jury instruction on voluntary intoxication. The evidence in this case fails to establish that the defendant did not know what he was doing. *Cf. Foster v. Commonwealth*, Ky., 827 S.W.2d 670 (1992). The arresting detective stated that although it appeared that Bills had been drinking, he was sober enough to talk to and he did not believe it necessary to conduct any tests for alcohol intoxication. This is not a case in which the defendant had no memory at all of the events. The mere fact that the trial court gave a voluntary intoxication instruction does not conclusively establish that Bills was entitled to such an instruction. *Moore v. Commonwealth*, Ky., 771 S.W.2d 34 (1989).

■ The instructions given by the trial judge followed the requirements of *Brown v. Commonwealth*, Ky., 575 S.W.2d 451 (1978). A jury instruction regarding the Commonwealth's alleged burden to specifically negate voluntary intoxication was not necessary. The jury was free under instructions No. 2 and 7 to find that Bills was not acting intentionally because of voluntary intoxication for any reason. The trial court's formulation of the jury instructions in this matter did not violate the Due Process Clause because jury instructions must be read as a whole. *See Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977).

Bills was not convicted of theft by unlawful taking in respect to the automobile and therefore any error in that instruction is of no consequence. *Rigsby v. Commonwealth*, Ky., 495 S.W.2d 795 (1973).

### IV

■ It was not reversible error for the trial judge to refuse to direct a verdict on the offense of first-degree sexual abuse.

K.R.S. 510.010(7) defines sexual contact as any touching of the sexual or other intimate parts of a person done for the purpose of gratification of the sexual desire of either party. Sexual contact is not limited to the sex organ. *See People v. Graydon*, 129 Misc.2d 265, 492 N.Y.S.2d 903 (N.Y.C.Crim.Ct.1985); *People v. Morbelli*, 144 Misc.2d 482, 544 N.Y.S.2d 442 (N.Y.C.Crim.Ct.1989).

The victim testified that while inside the automobile and close to the time after Bills forced her to perform oral sex on him, he also pulled off her shirt and sweatpants and underpants.

... He kept touching me and he pulled my shirt up and I had sweatpants on and my sweatpants and underwear down and kept touching me....

■ We find the commentary to Section 7 useful in understanding the term "sexual contact" as any touching of the sexual or other intimate parts of a person not married to the actor for the purpose of gratifying the sexual desire of either party. An actual touching is required, but the contact need not be directly with the body. For example, touching another person's sex organs through clothing would be within the purview of this definition. The touching must be done for the purpose of sexual gratification. Clearly, the definition does not include inadvertent or accidental touching of the intimate parts of another person. It was within the province of the jury to determine by method of reasonable inference whether the situation described here amounted to sexual contact.

It is not necessary for the victim/witness to completely articulate what sexual or other intimate parts of her body were touched by the aggressor. The act of touching while removing the clothing was totally

unnecessary and independent of the act of oral sodomy. The two acts did not merge.

■ We are persuaded that in *People v. Graydon*, 129 Misc.2d 265, 492 N.Y.S.2d 903 at 904 (1985), the New York trial court aptly expressed the analysis of the statutory definition when it said in part: "The leg is an 'intimate' part of the body, and a common sense interpretation of the language of the statute indicates that 'intimate' is not a rephrasing of 'sexual.'" By including the word "other," the statute provides a broader category of "intimate" parts. The abuse of the victim's body and privacy with the intent to obtain sexual gratification is sufficient to constitute sexual abuse. It should be perfectly clear that it was the intention of the legislature to protect victims from this type of attack.

■ Certainly a proper test to determine if the part of the body is "intimate" should revolve around an examination of three factors: 1) What area of the body is touched; 2) What is the manner of the touching, and 3) Under what circumstances did the touching occur. *Graydon, supra,* was affirmed in *People v. Morbelli,* 144 Misc.2d 482, 544 N.Y.S.2d 442 (1989). We recognize that *Graydon* and *Morbelli* involve New York misdemeanor crimes with minor children, but the definition and analysis make universal sense.

■ The Kentucky statutory definition of sexual contact when the term "other intimate parts" is used encompasses parts of the body of the victim other than sexual organs alone. During the act of removing her clothing, Bills touched her sexual and other intimate parts of her body. The fact that Bills had previously made sexual advances toward the victim in Lexington indicates that he was acting for the purpose of sexual gratification. The victim had testified that Bills put a chair between her legs and began touching her thigh. The removal of the victim's clothing was unnecessary in regard to the sex act involving oral sodomy. The two acts did not merge even though they may have occurred close in time. The contact was not incidental but rather related to sexual gratification. *Cf.*

*Hampton v. Commonwealth,* Ky., 666 S.W.2d 737 (1984).

Under the evidence taken as a whole, it was clearly not unreasonable for the jury to find Bills guilty of first-degree sexual abuse. *Benham v. Commonwealth,* Ky., 816 S.W.2d 186 (1991).

V

■ The rule against using the defendant's right to silence and right to counsel as substantive evidence of guilt or to impeach the testimony of the defendant was not violated. KSP Detective Stephens related that the day after Bills' arrest, he went to the Madison County Jail to photograph and fingerprint him. Detective Stephens testified that he did not advise the defendant of his *Miranda* rights because he did not intend to question Bills who had been advised the night before, after his arrest, and had requested an attorney.

At that point, trial counsel for Bills moved for a mistrial because the witness had indicated that Bills had refused to talk to the police and asked for an attorney. Bills' trial counsel conceded that the Commonwealth's Attorney did not request the witness to disclose that information. Bills' counsel noted his previous objection in reference to Bills' statement to his wife that she not speak to police. The trial court commented that the witness' statement is not prejudicial by itself and overruled the motion for mistrial. The Commonwealth Attorney agreed to warn the witness against any further discussion of that matter.

We cannot accept Bills' argument. The inadvertent mention of his request for counsel was not argued to the jury, nor was it used to impeach him. The inadvertent reference did not deprive Bills of a fair trial. *See Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); *Lindgren v. Lane,* 925 F.2d 198 (7th Cir. 1991). Bills did not request that the jury be admonished to disregard the statement. *Hall v. Commonwealth,* Ky., 817 S.W.2d 228 (1991); *West v. Commonwealth,* Ky., 780 S.W.2d 600 (1989).

■ There was evidence in the record that Bills, in the presence of police officers, shouted to his wife as he was being arrested not to speak to police. Bills submits that what was "shouted" was an exercise of a right granted him under K.R.S. 421.-210(1), and it was reversible error for the prosecutor to use and comment on that right. We do not agree.

K.R.S. 421.210(1) states in part that a husband or wife may testify as other witnesses, except as to confidential communications made during the marriage. The statute is simply not applicable to this case. Mrs. Bills was not a witness for either party. Also, since Bills made his statement to his wife in the presence of police officers, it was not a confidential communication.

■ Evidence regarding the circumstances under which the defendant was arrested is properly admissible evidence during trial. *Wiley v. Commonwealth,* Ky.App., 575 S.W.2d 166 (1978).

Finally, after carefully reviewing the record, we reject Bills' contention that the prosecution presented a very weak case; that the defense presented an overwhelming case that Bills wanted nothing from the victim but a ride home; and that the jury was clearly influenced by the unstated concerted effort on the part of the prosecution team to plant in the minds of the jurors the idea that Bills had to be guilty because he remained silent, asked for an attorney and told his wife not to disclose any marital communications.

As previously mentioned, the victim's testimony was corroborated by her bruise under her eye, the testimony from the occupant of the adjoining motel room, her statement to the Sheriff's Deputy upon their arrival and the retrieval of her business card from Bills' residence. Bills' testimony was very specific as to some details, but he very conveniently claims he was too intoxicated to remember key details such as assaulting the victim and whether or not he forced her to engage in fellatio.

Under the circumstances of this case, any possible error was harmless beyond a reasonable doubt. *See Milburn v. Commonwealth,* Ky., 788 S.W.2d 253 (1990); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## VI

■ It was not reversible error to permit the comments made by the prosecutor during closing argument. The prosecutor may draw all reasonable inferences from the evidence and announce his own theory to explain the evidence and why it supports the guilt of the defendant. *Cf. Nugent v. Commonwealth,* Ky., 639 S.W.2d 761 (1982).

## VII

In view of the decision of this Court in *Sanders v. Commonwealth,* Ky., 844 S.W.2d 391 (1992), rendered November 19, 1992, interpreting K.R.S. 439.3401(3), Bills will be eligible for parole consideration after he has served a period of confinement of twelve years.

The judgment of conviction is affirmed in all other respects.

STEPHENS, C.J., and REYNOLDS and SPAIN, JJ., concur.

LAMBERT, J., concurs by separate opinion.

LEIBSON, J., dissents by separate opinion, in which COMBS, J., joins.

LAMBERT, Justice, concurring.

I wrote a dissenting opinion in *Commonwealth v. Lundergan,* Ky., 847 S.W.2d 729 (rendered February 18, 1993), and concluded that the "rule of lenity" was without any application. I have reached a similar conclusion in this case and for that and other reasons, have joined the majority opinion and declined to join Justice Leibson's dissenting opinion.

Despite the foregoing, I agree with Justice Leibson that this Court has engaged in an inconsistent application of the rule of lenity. The logical underpinning for the opinions in *Lundergan* are as applicable here as there, but the result is different. While the cases differ in that one involved a political crime while the other was a

vicious sex crime, the rule of law should be the same.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

We have placed beyond the reach of Randall Bills the same "rule of lenity" in construing criminal statutes to which the majority so recently showed great deference in *Commonwealth v. Lundergan*, Ky., 847 S.W.2d 729 (rendered 2/18/93). As we stated in the *Lundergan* case, "doubts about the meaning of a penal statute should be resolved[ ] 'in favor of lenity' " and against a construction that would produce "harsh or incongruous results" or "disproportionate" punishment. *Lundergan* counsels us to remember "[t]he notions of fairness which lie at the heart of the rule."

> "Penal statutes are not to be extended by construction, but must be limited to cases clearly within the language used." *Woods v. Commonwealth*, Ky., 793 S.W.2d 809, 814 (1990).

I respectfully suggest that Randall Bills is entitled to the same "notion of fairness" that we applied in former State Representative Gerald Lundergan's case, albeit Bills' crime is a repulsive sexual offense rather than a political one. The rule of lenity applies in a construction of any criminal statute which "does not expressly and unambiguously warn a potential violator" of penal consequences. *Lundergan, supra*, Draft Opinion, p. 6.

There are three different instances in this case where our Court decides close questions regarding the appropriate meaning to ascribe to the penal statutes at issue, and on each and every occasion our Court elects to give the statutes in question a "harsh" rather than a "lenient" construction.

## I. INSTRUCTION ON ATTEMPTED SODOMY

As the Majority summarizes, although the victim testified at trial that Bills "was able to place his penis in the victim's mouth," she also admitted that she had "told a Kentucky State Police detective in a written statement that she had kept her mouth shut." It may well be, as the Majority states, that she stated "on cross-examination, she meant that she did not open her mouth voluntarily." But there can be no doubt but that the jury rather than this Court should choose whether to believe the first account which she gave to the police or her testimony and explanation in court.

The construction the Majority of our Court gives to the sodomy statute eliminates the word "intercourse" from "deviate sexual intercourse," and by so construing the statute eliminates the trial court's error in failing to instruct on attempted sodomy. We hold that "penetration is not a necessary element to the crime of sodomy as defined in the penal code," that mere contact between the penis and the mouth satisfies the definition of KRS 510.010(1). The statute states:

> " 'Deviate sexual intercourse' means any act of sexual gratification involving the sex organs of one (1) person and the mouth or anus of another."

The question Bills raises is at what point does Bills' *attempt* to obtain sexual gratification become an "*act* of sexual gratification." [Emphasis added.] If, as the victim stated to the police, Bills got no further than "contact," a common sense view of this scenario, however disgusting and repulsive, is he attempted to obtain sexual gratification by forcing oral intercourse upon the unfortunate victim, but failed to do so. It is an extremely harsh and unreasonable interpretation of the statute to deny a defendant on trial the right to an instruction under which the jury could find, if it so believed, that the facts never crossed the line between an attempt and a completed act.

Worse yet, by publishing this Opinion, we construe the statute as meaning in all cases that " 'mere contact' between the penis and the mouth constitutes deviate sexual intercourse." Sexual gratification may (or may not) occur from an attempt to commit oral intercourse stopped short of penetration.

The question here is not whether we believe sodomy occurred, as the victim so testified in court, but only whether there was evidence which justified an instruction on the lesser included offense. Do we really want to extend the statute to make "mere contact" subject to punishment as sodomy under all circumstances? Or should we leave it to the jury to decide whether the facts satisfied the statutory definition of "deviate sexual intercourse," without adding to that definition? We have given an extremely severe interpretation to the sodomy statutes. Common sense tells us there are situations where sodomy has not occurred with "mere contact." There was evidence from which the jury might have concluded that this is one of those situations.

## II. INSTRUCTIONS ON FIRST AND SECOND DEGREE UNLAWFUL IMPRISONMENT

The elements of kidnapping (KRS 509.-040), as it applies in this case, differ from the elements of first-degree unlawful imprisonment only in that kidnapping requires the intent of the unlawful restraint to be "to accomplish or advance the commission of a felony," while first-degree unlawful imprisonment requires only that the unlawful restraint be "under circumstances which expose [the victim] to a risk of serious physical injury." Second-degree unlawful imprisonment simply requires knowing and unlawful restraint without regard to intent.

The evidence in this case underlying the charge of kidnapping was the victim's testimony she was compelled at gun and/or knife point to go with the appellant, intending to force her to submit to felonious sexual assault. The appellant's testimony, credible or not, was that the victim voluntarily undertook to drive him home, and that his efforts to engage the victim in a sexual act occurred only after the car ride had ceased, rather than constituting his purpose in taking the journey.

Under these circumstances, the appellant was entitled to instructions on the lesser included offenses of first and second degree unlawful imprisonment, and the trial court erred when it refused to give such instructions.

The Majority Opinion has avoided the error by suggesting the kidnapping conviction could apply to the period "that Bills held her [the victim] prisoner inside her motel room for at least 20 minutes while he struck, choked, threatened and touched her body in an inappropriate sexual manner." Bills' claim that he was entitled to instructions on first and second degree unlawful imprisonment as a lesser included offense rested on proof of his intent in the later act of transporting the victim in the car, rather than what occurred in the hotel room, so the Majority has concluded "[n]othing in the testimony of either witness to this [earlier] episode would justify an instruction on unlawful imprisonment."

But this construction of the kidnapping statute is wrong for two reasons:

1) First it ignores the force and effect of KRS 509.050, which excludes an incident of restraint from the scope of the kidnapping statute when the interference with the victim's liberty occurs immediately with and incidental to the commission of the offense charged, which in this case covers the offenses committed against the victim in the hotel room.

2) Second it ignores the trial court's instructions, which implicitly recognized that the episode of restraint underlying the kidnapping charge was not the episode in the hotel room but taking the victim for a ride intending to accomplish a felonious sexual assault. The kidnapping instruction obviously intended to refer to this episode in the car rather than the earlier episode in the hotel room because they did not specify intent to "inflict bodily injury or to terrorize the victim KRS 509.040(1)(c)," but intent to "accomplish or to advance the commission of a felony KRS 509.040(1)(b)."

Appellant's Brief cites the following quote from the ALI, *Model Penal Code and Commentaries*, Part II, § 212.2, pp. 240–42 (1980):

"[T]his section [unlawful imprisonment] comes into play for substantial removal ... that is not accompanied by one of the

designated kidnapping purposes. Thus, for example, the actor who uses a gun to force another to drive him somewhere engages in unlawful restraint under circumstances exposing the victim to risk of serious bodily harm ... [I]f his purpose was merely to obtain transportation, he is liable only for the lesser offense of felonious restraint."

The Majority's Opinion here is in conflict with the ALI Model Penal Code from which the statutes in question were taken.

Thus, once again, the Majority Opinion ascribes an unreasonably broad interpretation to a statute, in this case the kidnapping statute, so as to avoid the trial court's error in refusing instructions on the lesser included offenses.

### III.  PAROLE ELIGIBILITY

Finally, the Majority takes up the difference between KRS 532.080(7), which provides that the minimum parole eligibility for a person sentenced as a PFO I shall be ten years, and KRS 439.3401(3), which provides that the minimum parole eligibility for a person convicted as a "violent offender" (which the statute defines) shall be fifty percent of the sentence imposed, and reaches the indefensible conclusion that the statutes are "not in conflict." The conflict is obvious in Bills' case, because if the PFO statute prevails, he would be eligible to be considered for parole after he has served ten years, whereas under the violent offender statute he would not be eligible until he has served at least half of a sixty year term, or thirty years, subject, of course, to our recent judicial revision of the violent offender statute in *Sanders v. Commonwealth*, Ky., 844 S.W.2d 391 (1992), rendered 11/19/92, long after the present case was tried.

The Majority concludes the obvious intent of the General Assembly is that these statutes should be complete, and that minimum parole eligibility should not be controlled by either one of these statutes, but instead should be determined by applying whichever statute postpones parole eligibility for the longest possible time. The Majority gives no reason for believing the

General Assembly intended that minimum parole eligibility should turn on which statute postpones parole eligibility for the longest time rather than the shortest time, and any decent consideration for the rule of lenity would demand the opposite interpretation.

The situation thus created by the Majority Opinion is one in which we will use the violent offender statute rather than the PFO statute, but only where it results in a more severe penalty. I see no consistency in straining the rule of lenity to cover the *Lundergan* case (*supra*), and then denying its application in present circumstances.

For the reasons stated, I dissent.

COMBS, J., joins this dissent.